J-A25007-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| IAN CHRISTOPHER BRENNER | : | |
| | : | |
| Appellant | : | No. 610 MDA 2020 |

Appeal from the PCRA Order Entered March 23, 2020
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0002170-2006

BEFORE:  BOWES, J., OLSON, J., and KING, J.

MEMORANDUM BY BOWES, J.:                **FILED MAY 18, 2021**

Ian Christopher Brenner appeals from the order that denied his Post Conviction Relief Act ("PCRA") petition.  Upon careful review, we affirm.

On October 9, 2005, Appellant himself was the victim of a shooting. Appellant was struck in the leg and arm.  N.T. Jury Trial, 8/6/14, at 23.  At the hospital, Appellant refused to provide the name of the friend who had driven him to the hospital and stated that he did not know who shot him.  *Id*. at 24-25.  After he left the hospital, Appellant declined to respond to officers when they attempted to speak further with him about the incident and the case was closed.  *Id*. at 34.  A few days prior to the subsequent retaliatory shooting that led to the convictions underlying this appeal, Apollonia Snyder overheard Appellant talking on a cellphone, stating that "he was going to pop Supreme when he seen him."  *Id*. at 42.  During the conversation, Appellant was handling a firearm in his lap.  *Id*.

Ten days later, at 9:30 p.m. on October 19, 2005, shots were fired outside of Allison's Bar in the City of York, resulting in the death of Anna Witter, who was struck by a ricocheting bullet. Anthony Zawadzinki and Alfonzo King were also shot, but survived. Alfonzo King had been standing near Jeffrey Mable a/k/a "Supreme," the person who was the shooter's apparent target. All of the victims were shot with the same firearm, which was never recovered.

Police responded quickly, detaining multiple potential eyewitnesses on scene and in the immediate vicinity. Daniek Burns identified the shooter as Appellant, the target of the first shot as Supreme, and gave a description of the shooter's appearance. *See* N.T. Jury Trial, 8/5/14, at 402, 418, 437 (identifying Appellant, describing his outfit as a hoodie with the hood up, white tee shirt underneath, blue jeans, and black shoes, and explaining that the shooter aimed at Supreme first). Other witnesses provided similar descriptions, but did not identify the shooter. *See* N.T. Jury Trial, 8/5/14, at 246 (Alfonzo King describing the shooter as tall, stocky, and wearing a dark hoodie); *see also* N.T. Jury Trial, 8/6/14, at 89-90 (explaining that while the lighting was good, Tina Ashley could not identify the shooter because he wore a gray hoodie with the hood up and had a dark complexion, but she was certain that the shooter was not Appellant); *id*. at 124-25 (Alicia Brittner describing the shooter as wearing jeans and a hoodie over the head, but that it was too dark to see who the shooter was); *id*. at 179-80 (Lloyd Valcarcel stating that the shooter was wearing a black hoodie with the hood up, white

t-shirt, blue jeans, and black shoes. However, he could not identify the shooter because he did not get a good look at him, like Daniek Burns did); *id*. at 225 (Supreme explaining that he only had a second or two to look before he dropped to the ground and feigned death, but the shooter was wearing a big black hoodie with the hood up). While being interviewed on the scene, Tina Ashley pointed in Supreme's general direction and yelled "he knows who was shooting. They were shooting at him." N.T. Jury Trial, 8/4/14, at 141.

A warrant was issued for Appellant's arrest, and six days after the shooting, he turned himself in. Upon arrest, Appellant's black Jordan sneakers, belt, and blue jeans were taken from him and submitted for forensic testing. *See* N.T. Jury Trial, 8/5/14, at 356. The black hoodie that Appellant was wearing when arrested was later separately submitted for forensic testing. *Id*. at 295, 319-20. All of the items taken from Appellant matched some of the eyewitness accounts of what the shooter was wearing and tested either consistently with or positive for gunshot residue. *Id*. at 301, 325-30. Appellant's belt had by far the highest concentration of gunshot residue of all the items that were submitted, and the inside had markings consistent with "something rubbing up against it on a regular basis". *Id*. at 297, 325-26.

A federal grand jury proceeding was initiated against Appellant. N.T. Jury Trial, 9/13/06, at 41-57. However, before the grand jury had finished hearing testimony, the United States Attorney's Office decided that "the first jury to hear this case should be a jury from the court of common pleas of York where the homicide allegedly took place." N.T. Jury Trial, 9/13/06, at 46.

Accordingly, the inquiry was concluded and Appellant proceeded to a jury trial in the York County Court of Common Pleas.

At the trial, the Commonwealth presented Charles Maner, who testified that Appellant discussed the shooting with him while they were housed together in the York County Prison. *See* N.T. Jury Trial, 9/12/06, at 209-12. According to Maner, Appellant accidentally shot a woman and felt bad about it, because he had intended to hit the person who had shot him earlier that month. *Id*. at 212-14. The defense countered with Tawanna Chavis, who testified that Appellant was at her house the entire night of the shooting. *See* N.T. Jury Trial, 9/14/06, at 135.

The jury convicted Appellant of the first-degree murder of Anna Witter, aggravated assault—serious bodily injury of Alfonso King, aggravated assault—bodily injury with a deadly weapon of Anthony Zawadzinski, and the attempted homicide of Jeffrey Mable. *See* N.T. Jury Trial, 9/14/16, at 120. In total, Appellant was sentenced to serve life imprisonment without the possibility of parole ("LWOP"), plus a consecutive term of five to ten years. On direct appeal, we affirmed Appellant's judgment of sentence and our Supreme Court denied his petition for allowance of appeal. *Commonwealth v. Brenner*, 998 A.2d 998 (Pa.Super. 2010) (unpublished memorandum), *appeal denied*, 13 A.3d 474 (Pa. 2010).

Appellant filed a timely, counseled PCRA petition. During the PCRA proceedings, Appellant was represented by Joseph Sembrot, Esquire. After two evidentiary hearings, at which PCRA counsel called former Assistant

District Attorney ("ADA") Bill Graff, trial counsel Mark Keenheel, Charles Maner's trial counsel, two character witnesses, his private investigator, Appellant, and multiple fact witnesses, the PCRA court denied his petition. An appeal followed, wherein Appellant reiterated the many allegations of ineffective assistance of counsel and asserted that the Commonwealth had committed a **Brady**[1] violation by failing to disclose alleged consideration afforded to Charles Maner in exchange for his testimony against Appellant. We reversed the PCRA court order, vacated Appellant's convictions, and remanded for a new trial after finding that trial counsel was ineffective when he failed to discuss the possibility of calling character witnesses with Appellant pre-trial. **See Commonwealth v. Brenner**, 81 A.3d 1010 (Pa.Super. 2013) (unpublished memorandum). Due to the resolution of this issue, we did not reach the **Brady** issue or the other remaining issues. Appellant filed a petition for allowance of appeal, which was denied. **See Commonwealth v. Brenner**, 80 A.3d 774 (Pa. 2013).

Upon remand in a new trial court, Appellant proceeded with pre-trial motions, including an omnibus pretrial motion seeking to suppress the photographic identification of Appellant by Daniek Burns as unduly suggestive. After a hearing and submission of a brief on the remaining issues, the trial court denied Appellant's omnibus pretrial motion. Appellant also filed a motion *in limine* attempting to preclude the Commonwealth from admitting the prior

---

[1] **Brady v. Maryland**, 373 U.S. 83 (1963).

testimony of now-deceased, and therefore unavailable, Daniek Burns. The Commonwealth countered that Attorney Keenheel was not found ineffective due to any alleged deficiencies in his handling of Burns. Since Appellant had a full and fair opportunity for cross examination while represented by counsel, the Commonwealth maintained that Daniek Burns's prior testimony should be admitted. The trial court agreed, denying Appellant's motion *in limine*.

Appellant proceeded to his second jury trial in August of 2014. Attorney Sembrot continued to represent Appellant. At re-trial, the Commonwealth admitted and placed before the jury the prior trial testimony of Daniek Burns, Anthony Zawadinski, and Detective Troy Cromer. Unlike the first trial, the Commonwealth did not call Charles Maner or an Assistant United States Attorney to explain the federal grand jury proceeding that preceded the filing of these charges in state court. Appellant did not present an alibi defense or any character witnesses. Instead, he called three fact witnesses in an attempt to discredit Daniek Burns's identification of Appellant as the shooter. The witnesses testified that the conditions did not allow for an accurate identification of the shooter, beyond basic descriptors. At the conclusion of the second trial, Appellant was again convicted of first-degree murder, attempted murder, aggravated assault—serious bodily injury, and aggravated assault—deadly weapon.

The trial court imposed a sentence of LWOP plus a consecutive five to ten years of imprisonment, which was the same sentence that Appellant received after his first trial. A direct appeal followed, wherein Appellant raised

eleven claims of trial court error which fell into three categories: weight of the evidence, sufficiency of the evidence, and evidentiary challenges. We affirmed Appellant's judgment of sentence and our Supreme Court denied his petition for allowance of appeal. *See Commonwealth v. Brenner*, 156 A.3d 347 (Pa.Super. 2016) (unpublished memorandum), *appeal denied*, 165 A.3d 897 (Pa. 2017).

Appellant submitted a timely counseled PCRA petition raising sixteen allegations of ineffective assistance of Attorney Sembrot, who was original PCRA and re-trial counsel. The PCRA court held two days of evidentiary hearings, during which PCRA counsel called Nathanial "Man" Williams, an expert witness on eyewitness identification, Attorney Sembrot, Appellant, and Yolanda Dorman. Appellant submitted a substantial post-hearing brief, which the PCRA court closely scrutinized before issuing an order and opinion denying the petition. This timely appeal followed. Both Appellant and the PCRA court complied with the mandates of Pa.R.A.P. 1925, and thus, this appeal is ready for our disposition.

Appellant raises the following issues for our review:

1. Whether counsel was ineffective in neglecting to present evidence which would have demonstrated that a full and fair opportunity to cross-examine Daniek Burns did not occur?

2. Whether counsel was ineffective in failing to present expert testimony on the fallability [sic] of eyewitness identifications where counsel could not cross-examine the key eyewitness?

3. Whether counsel was ineffective in failing to object to the admission of gun shot residue evidence, which violated

[Appellant's] confrontation clause rights under the federal and Pennsylvania constitutions?

4. Whether counsel was ineffective for failing to adequately cross-examine Detective Fetrow?

5. Whether counsel was ineffective in declining to present evidence that [Appellant] had legally purchased firearms, was licensed to carry a firearm, and that another sweatshirt not alleged to have been used in the crime had the same alleged gun-shot residue particles as other clothing introduced, which would have demonstrated legitimate reasons for gun-shot residue being on his belt?

6. Whether counsel was ineffective in neglecting to investigate, interview, and present witnesses that [sic] would have directly undermined Apollonia Snyder Johnson's testimony?

7. Whether counsel was ineffective in failing to object to myriad instances of prosecutorial misconduct during closing arguments, including calling [Appellant] as "cold a killer as there exists"?

8. Whether counsel was ineffective in failing to question Tina Ashley and call Officer Randy Searfoss regarding statements Ms. Ashley made at the scene that the Commonwealth misleadingly used to imply that the shooter's target was Jeffrey Mable?

9. Whether counsel was ineffective in failing to introduce photographs demonstrating the poor lighting conditions at the scene?

10. Whether counsel was ineffective in declining to file a pre-trial motion to bar re-trial based on double jeopardy under the Pennsylvania and federal constitutions, due to egregious prosecutorial misconduct related to Commonwealth witness Charles Maner?

11. Based on all of the aforementioned claims, the cumulative errors in this matter were so significant that they deprived [Appellant] of a fair trial in violation of his due process rights and his state and federal constitutional right to a fair trial.

Appellant's brief at 10-11.[2]

We begin with the pertinent legal principles. Our "review is limited to the findings of the PCRA court and the evidence of record" and we do not "disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error." *Commonwealth v. Rykard*, 55 A.3d 1177, 1183 (Pa.Super. 2012). "We grant great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record. However, we afford no such deference to its legal conclusions." *Id*. "[W]here the petitioner raises questions of law, our standard of review is *de novo* and our scope of review is plenary." *Id*. When examining a mixed question of law and fact, the level of deference afforded to the PCRA court is analyzed on an issue-by issue basis. *See Commonwealth v. Martin*, 5 A.3d 177, 197 (Pa. 2010). "The more fact intensive the determination, the more deference a reviewing court should afford that conclusion." *Id*.; *see e.g.*

---

[2] We cannot overemphasize the importance of focused appellate advocacy. Experienced advocates find that selecting the few most important issues presents the greatest likelihood of success. *See Jones v. Barnes*, 463 U.S. 745, 751-52 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."); *Commonwealth v. Robinson*, 864 A.2d 460, 480 (Pa. 2004) ("Legal contentions, like the currency, depreciate through over-issue."); *Commonwealth v. Ellis*, 626 A.2d 1137, 1140-41 (Pa. 1993) ("Appellate advocacy is measured by effectiveness, not loquaciousness."). *See also* RUGGERO J. ALDISERT, J. WINNING ON APPEAL: BETTER BRIEFS AND ORAL ARGUMENT, 129 (2d ed. 2003) ("When I read an appellant's brief that contains more than six points, a presumption arises that there is no merit to **any** of them." (emphasis in original)).

*Commonwealth v. Cox*, 983 A.2d 666, 689 (Pa. 2009) (concluding that the PCRA court did not commit an abuse of discretion when it rejected appellant's IAC claim for failure to object to a prosecutor's closing argument since the remark constituted a fair response to trial counsel's closing argument). Finally, we "may affirm a PCRA court's decision on any grounds if the record supports it." *Id*.

Appellant alleges many claims of ineffective assistance of counsel ("IAC"). In reviewing IAC claims, counsel is presumed to be effective, and a PCRA petitioner bears the burden of proving otherwise. *See Commonwealth v. Becker*, 192 A.3d 106, 112 (Pa.Super. 2018). To do so, a petitioner must plead and prove that: (1) the legal claim underlying his ineffectiveness claim has arguable merit; (2) counsel's decision to act (or not) lacked a reasonable basis designed to effectuate the petitioner's interests; and (3) prejudice resulted. *Id*. The failure to establish any of the three prongs is fatal to the claim. *Id*. at 113.

Where a petitioner asserts a layered IAC claim, he must plead and prove each prong of the three-prong ineffectiveness test for each of the attorneys involved. *Commonwealth v. Chmiel*, 30 A.3d 1111, 1128 (Pa. 2011). As we have explained:

> Layered claims of ineffectiveness are not wholly distinct from the underlying claims, because proof of the underlying claim is an essential element of the derivative ineffectiveness claim . . . . In determining a layered claim of ineffectiveness, the critical inquiry is whether the first attorney that the defendant asserts was ineffective did, in fact, render ineffective assistance of counsel. If

that attorney was effective, then subsequent counsel cannot be deemed ineffective for failing to raise the underlying issue.

**Rykard**, **supra** at 1190 (citations and quotations omitted).

With these principles in mind, we address Appellant's IAC claims *seriatim*.

## I. Confrontation Clause:  Prior Trial Testimony

In Appellant's first layered IAC claim, Appellant attacks the admission of Daniek Burns's prior trial testimony as a violation of the confrontation clause.  He alleges that Attorney Keenheel's[3] ineffectiveness denied him a full and fair opportunity for cross-examination, and that Attorney Sembrot[4] was ineffective for not seeking to exclude this testimony from Appellant's re-trial on that basis.  Specifically, Appellant alleges that Attorney Keenheel's failure to question Daniek Burns about an incident where he was allegedly stopped for possession of a small amount of drugs, fled the scene, and was never charged, denied him of a fair and full cross-examination of Daniek Burns.  This incident was discussed by Detective Fetrow during the federal grand jury proceeding as a possible reason why Daniek Burns may have absconded.  While Detective Fetrow speculated that the reason for flight was Burns's fear that "he would be next" for identifying Appellant, the detective also opined

---

[3] Attorney Keenheel was Appellant's counsel at his first trial.

[4] Attorney Sembrot was Appellant's counsel at his first PCRA proceeding and subsequent re-trial.

that Burns's fear of potential criminal prosecution could have also played a role in the decision. *See* N.T. Grand Jury Proceeding, 2/15/06, at 20. The Commonwealth provided Appellant with the transcript prior to the first trial, and Attorney Keenheel referenced the proceeding in his opening statement.

Whether the trial court's admission of Daniek Burns's prior trial testimony violated Appellant's constitutional right to confront the witnesses against him is a question of law, as to which our review is *de novo* and plenary. *See Commonwealth v. Mitchell*, 152 A.3d 355, 358 (Pa.Super. 2016). Generally, an unavailable witness's prior recorded testimony is admissible at trial, and will not offend the right of confrontation, where the defendant had counsel and a "full and fair opportunity" to cross-examine that witness at the prior proceeding. *Commonwealth v. Bazemore*, 614 A.2d 684, 687 (Pa. 1992). Relying on *Commonwealth v. Mangini*, 425 A.2d 734 (Pa. 1981), Appellant contends that Attorney Keenheel was ineffective in his cross-examination of Burns and therefore, Appellant was denied his right to full and fair cross-examination at the re-trial. Therefore, he contends that his right to confrontation has been violated. For the following reason, we disagree.

In *Mangini*, a new trial was granted after original trial counsel was declared ineffective due to his failure to request a competency hearing for a key Commonwealth witness. Prior to the retrial, a competency hearing was held and the Commonwealth's key witness was found incompetent. At the second trial, the trial court allowed the Commonwealth to admit the now-

unavailable witness's prior trial testimony over defense objection. Mangini was re-convicted. On appeal, Mangini argued that prior counsel's ineffectiveness in failing to ask for a competency hearing had tainted the key witness's prior testimony, so that its later admission violated the confrontation clause. Our Supreme Court agreed, and reversed the admittance of the prior trial testimony. In doing so, the *Mangini* Court explained that the use of "the very testimony which has been indelibly stamped with prior counsel's ineffectiveness [was] offensive to our sense of justice and the notion of fair play." *Id*. at 738. However, the Court also cautioned against construing its holding too broadly, explaining that:

> our holding today is not a *per se* rule requiring the exclusion of any testimony from a prior trial wherein trial counsel had been ineffective. All of the factual variables of each case must be examined to determine if the ineffectiveness so tainted the testimony sought to be introduced as to affect its reliability or to otherwise render its subsequent use unfair.

*Id*. at 739.

Here, Attorney Keenheel was found ineffective solely for failing to consult with Appellant about whether he wished to call character witnesses. However, Attorney Sembrot did not allege and Attorney Keenheel was never found to be ineffective due to any alleged deficiencies in his handling of Daniek Burns, a fact witness. Therefore, *Mangini* is distinguishable from this case because there was no prior IAC ruling on the issue that would have necessitated exclusion. As *Mangini* found, simply because trial counsel was ineffective in one area does not necessarily taint his entire representation of

Appellant. Therefore, Appellant cannot rely solely on the previous ineffectiveness finding to prove his claim of Attorney Keenheel's ineffectiveness. Instead, he must plead and prove that Attorney Keenheel was ineffective in his cross-examination of Daniek Burns on these newly asserted grounds.

Since Appellant did not challenge Attorney Keenheel's cross-examination of Daniek Burns in his first PCRA petition, this allegation is waived unless he proves that Attorney Keenheel was ineffective in his cross-examination and that Attorney Sembrot was ineffective for failing to raise it. *See Commonwealth v. Mason*, 130 A.3d 601, 618 (Pa. 2015) ("A PCRA claim is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, or on appeal or in a prior [PCRA] proceeding"); *see also Commonwealth v. Dennis*, 950 A.2d 945, 954 (Pa. 2008) ("Where claims of trial counsel ineffectiveness . . . could previously have been litigated . . . the only way a petitioner can successfully mount a challenge to the effectiveness of counsel is to assert a "layered" claim of ineffectiveness").

Here, Appellant has failed to establish that Attorney Keenheel was ineffective in his cross-examination of Daniek Burns. While Appellant called Attorney Sembrot[5] at the PCRA hearing and questioned him regarding his trial

_____

[5] PCRA counsel Attorney Sembrat also served as re-trial counsel.

strategy with regard to this claim, Appellant did not attempt to introduce the testimony of Attorney Keenheel. Attorney Sembrat cannot be found ineffective for failing to pursue this confrontation clause claim, unless Attorney Keenheel was first ineffective in his handling of Daniek Burns's cross-examination. *See Commonwealth v. Reaves*, 923 A.2d 1119, 1127-28 (Pa. 2007) (explaining that to prevail upon a layered IAC claim a petitioner must present argument on the three prongs of the IAC test as to each relevant layer of representation). By not calling Attorney Keenheel at the evidentiary hearing at issue herein, Attorney Keenheel was never given the opportunity to explain his strategy, or lack of it, to permit us to determine whether counsel had a reasonable basis designed to effectuate Appellant's interests.

The burden of production and persuasion of a PCRA petition rests squarely on the petitioner's shoulders. *See Commonwealth v. Jones*, 596 A.2d 885, 888-89 (Pa.Super. 1991). In the absence of any evidence as to what original trial counsel's strategy may have been, we cannot find that the PCRA court abused its discretion in denying relief on this issue. *Jones*, *supra* at 888-89 (declining to find the reasonable basis prong satisfied after Appellant failed to call the alleged ineffective attorney as a witness at his PCRA hearing). Accordingly, this deficiency is fatal to his ineffectiveness allegations surrounding Daniek Burns's cross-examination.

Since Appellant has failed to persuade us that a confrontation clause violation occurred, the trial court did not err when it admitted the prior

testimony of Daniek Burns at the retrial. Further, since Appellant has failed to establish that Attorney Keenheel's cross-examination of Burns was constitutionally ineffective, Attorney Sembrot cannot be held ineffective for waiving this claim by failing to pursue it in Appellant's original PCRA petition. *See Commonwealth v. Spotz*, 896 A.2d 1191, 1214 (Pa. 2006) ("[C]ounsel will not be deemed ineffective for failing to raise a meritless claim[.]"). Accordingly, Appellant's first claim fails.

## II. Eyewitness Expert Testimony

In his second IAC claim, Appellant asserts that Attorney Sembrot as re-trial counsel was ineffective for failing to call an expert in eyewitness identification at his re-trial. While it had long been the law of Pennsylvania that such expert testimony was not admissible, the law changed shortly before Appellant's re-trial, allowing for such an expert. *See Commonwealth v. Walker*, 92 A.3d 766 (Pa. 2014).

In *Walker*, our Supreme Court recognized the potential advantages of expert testimony in the eyewitness arena and held that such testimony was no longer *per se* inadmissible. *Id*. at 792-93. In reaching this conclusion, the *Walker* Court expressly rejected reliance upon cross-examination and closing argument alone as sufficient to convey the relevant eyewitness factors to the jury. *Id*. at 786. Henceforth, expert eyewitness testimony would be admissible, at the discretion of the trial court, in cases where the

Commonwealth's proof of identity was solely or primarily dependent upon eyewitness testimony. *Id*. at 787-88.

We agree with the PCRA court that the testimony of an expert on eyewitness misidentifications would have been admissible. *See* PCRA Court Opinion, 3/19/20, at 23. The Commonwealth's primary evidence identifying Appellant as the shooter came from Daniek Burns's eyewitness identification. Accordingly, the Commonwealth introduced photographs of the scene, and asked officers who responded to the scene, as well as an emergency management specialist for the City of York, to testify about the favorable lighting conditions present in an attempt to buttress Daniek Burns's identification. In contrast at re-trial, the defense aggressively sought to discredit Daniek Burns's identification in opening and closing statements, through use of the prior cross-examination of Daniek Burns, and by calling three eyewitnesses. The three eyewitnesses were standing near Daniek Burns at the time that the shooting started. All three witnesses testified that they were unable to make an accurate identification of the shooter.

At the PCRA hearing, Dr. Dery Strange was qualified as an expert in eyewitness identification and testified that eyewitness misidentification is responsible in seventy to seventy-five percent of cases where DNA has exonerated people. *See* N.T. PCRA Hearing, 7/2/18, at 19-20. The amount of time needed to identify another person accurately is greatly influenced by the quality of lighting and distance. *Id*. at 22-24. She went on to describe

accepted measures for distance and lighting conditions necessary to make an accurate identification and opined that, based on her review of scene photographs and witness testimony, the conditions here fell below acceptable thresholds. *Id*. at 25. She also testified to other factors that can impact the validity of an identification, such as drug use, wearing a head covering, or "weapon focus," wherein crime victims focus exclusively on the weapon present instead of other forensically useful information. *Id*. at 27-31. Dr. Strange also described a study in which the results indicated that mis-recognition of familiar faces is much more likely under bad lighting conditions or shorter durations of time. *Id*. at 35-37.

After observing the witnesses at the trial and the PCRA hearing, the PCRA court held that Dr. Dery Strange's testimony would have been admissible at trial.[6] *See* PCRA Opinion, 3/19/20, at 23-24. Additionally, the court found that Attorney Sembrat had no reasonable basis for failing to seek the admission of this type of evidence. *Id*. However, the PCRA court still denied the claim due to a lack of prejudice, finding "no meaningful probability, nor even any real possibility of a different verdict resulting from a presentation of Dr. Strange's proffered testimony." *Id*. at 25. We find no basis to disturb the court's finding.

_____

[6] The Honorable Michael E. Bortner served as the re-trial and PCRA judge.

While Attorney Sembrot made no attempt to call an expert on eyewitness testimony, unlike in *Walker*, he also did not rely solely on cross-examination and closing argument to convey the relevant eyewitness factors to the jury. Attorney Sembrot also sought to discredit Daniek Burns's identification of Appellant through the testimony of three eyewitnesses who were standing near Daniek Burns at the time of the shooting. Each testified that he could not see the shooter clearly due to the hoodie partially covering his head and various combinations of light, distance, and timing constraints. One of the witnesses even stated that he spoke with Daniek Burns after the shooting and Burns stated that he was not able to identify the shooter. *See* N.T. Jury Trial, 8/6/14, at 130-31. Finally, Attorney Sembrot argued that Burns's identification was not believable in closing argument.

Further, Burns's identification of Appellant was not the only evidence of his guilt. The Commonwealth presented evidence of Appellant's motive to shoot Supreme, *i.e.*, his belief that Supreme was responsible for the shooting where he was injured ten days earlier than the shooting in question. *See* N.T. Jury Trial, 8/6/14, at 21-57. In support of this theory, the Commonwealth submitted the testimony of Apollonia Snyder, who overheard Appellant threating to "pop" Supreme while stroking a firearm, along with the officer who attempted to interview Appellant about the earlier shooting with limited success. *Id*. Witnesses from the scene also identified Supreme as the target. *See* N.T. Jury Trial, 8/4/14, at 141-42; N.T. Jury Trial, 8/5/14, at 257; *id*. at

437. Finally, Appellant's clothing tested positive for gunshot residue and the inside of his belt contained markings consistent with a gun holster. *See* N.T. Jury Trial, 8/5/14, at 297; *id*. at 325-26. Thus, in light of the other testimony adduced, we find no abuse of discretion in the PCRA court's determination that Appellant was not prejudiced by the absence of expert testimony on eyewitness identification.

## III. Confrontation Clause: Gunshot Residue Experts

In his third claim, Appellant alleges that Attorney Sembrot was ineffective at the re-trial for failing to object to the admission of A.J. Schwoebel's expert report, Allison Murtha's expert testimony, and Ms. Murtha's expert report regarding gunshot residue found on Appellant's clothing. The following legal principles pertain to our review.

Whether Appellant's rights under the confrontation clause were violated by the admission and use of the gunshot residue reports and testimony from Ms. Murtha is a question of law, for which our standard of review is *de novo* and our scope of review is plenary. *See Commonwealth v. Brown*, 185 A.3d 316, 409 (Pa. 2018) (plurality). The United States Supreme Court has held that forensic reports are testimonial in nature when their "primary purpose" is to establish or prove past events for purposes of proof at a criminal trial. *See Davis v. Washington*, 547 U.S. 813, 822 (2006). Therefore, the right to confrontation is violated when a testimonial forensic report is offered into evidence without the analyst's corroborating testimony. *See Brown*,

*supra* at 417-18 (holding that an autopsy report was testimonial in nature, so the report could only be introduced into evidence without its author's testimony if the author was "unavailable" and defendant "had a prior opportunity to cross-examine" him).

A.J. Schwoebel was the former manager and director of the forensic laboratory for the R.J. Lee Group. **See** N.T. Jury Trial, 8/5/14, at 307, 323-24. After the particle extraction samples were taken from each article and submitted for testing, A.J. Schwoebel analyzed the results and generated a report. *Id*. at 321-22. A.J. Schwoebel did not testify at the first trial and was unavailable to testify at the second one. *Id*. at 336. Ms. Murtha held Mr. Schwoebel's previous position as of the date of the second jury trial. *Id*. at 307. Accordingly, Ms. Murtha took the results from Mr. Schwoebel's reports and re-analyzed them in accordance with the current standard operating procedures, memorializing her findings in a supplemental report. Ms. Murtha testified at trial, and both her report and Mr. Schwoebel's report were admitted as evidence. *Id*. at 307-54.

The PCRA court found that A.J. Schwoebel's report should not have been admitted into evidence because its primary purpose was testimonial in nature, Mr. Schwoebel was unavailable for trial, and he did not testify previously. **See** PCRA Opinion, 3/19/20, at 91. However, Appellant was not prejudiced by this error, since the report was cumulative of Ms. Murtha's testimony and expert

report, which admission did not violate the confrontation clause. *Id*. at 90-94. We agree.

As the PCRA court accurately observed, the gunshot residue report prepared by Mr. Schwoebel was testimonial in nature, Mr. Schwoebel did not testify at the previous trial, and he was unavailable to testify at Appellant's second trial. Therefore, Appellant never had the opportunity to cross-examine him and the admission of his report into evidence was error. *See Bullcoming v. New Mexico*, 564 U.S. 647, 655 (2011) (holding that the admission of a missing analysist's report through a "surrogate" analysist who merely introduced the findings of the missing analyst violated the confrontation clause). However, his report was cumulative of Ms. Murtha's testimony. Therefore, the impact of this error necessarily depends on our resolution of Appellant's allegations concerning the admissibility of Ms. Murtha's testimony and expert report.

The High Court has held that the testimony of a surrogate analyst who merely "parrots" the original unavailable analyst's testimony is insufficient to vindicate the right to confrontation, since such testimony cannot expose any errors in the testing process employed by the analyst who authored the report. *See Bullcoming*, *supra* at 662. Our Supreme Court interpreted the *Bullcoming* holding to mean that the confrontation clause is not implicated where a surrogate analyst renders an "independent opinion" interpreting the results. *See Brown*, *supra* at 420-22. Additionally, it previously considered

what constitutes an "independent opinion" that satisfies the confrontation clause. **See Commonwealth v. Yohe**, 79 A.3d 520 (Pa. 2013).

The **Yohe** Court addressed whether the admission of a toxicology report in a driving under the influence ("DUI") case violated a defendant's rights under the confrontation clause. After the defendant's blood sample was tested three times by several analysts from one lab, a toxicologist received the raw data, analyzed the three tests, and arrived at a blood alcohol concentration ("BAC") result, which the toxicologist set forth in a report. The toxicologist signed the report, certifying its content and his own role in reviewing the data and ensuring its accuracy. At the defendant's trial, the BAC result was admitted into evidence through the toxicologist's expert testimony. The defendant objected that his right to confrontation was violated because the specific lab technicians who performed the tests did not testify. His objection was overruled.

On appeal, our Supreme Court found that the lab report was testimonial and that the toxicologist had not performed any of the tests. However, our Court nevertheless held that the defendant's confrontation clause rights were not violated. While the toxicologist relied on raw data produced by lab technicians in reaching an expert opinion, he was the only individual who engaged in the critical comparative analysis of the results of the testing, which was needed in order to generate a BAC. **Id**. at 539-40 ("[The toxicologist] was at the top of the inferential chain, and utilized the data that preceded his

analysis in reaching his conclusion."). The Court highlighted the toxicologist's unique role. As the lab supervisor, he was generally familiar with standard procedures and able to identify any deviations from his procedure or any problems with a particular lab technician. Accordingly, he was able to evaluate the entire record and was the proper object of the defendant's right to confrontation.

Here, like the toxicologist in *Yohe*, Mr. Schwoebel and Ms. Murtha do not appear to have played any role in extracting the particle samples from the articles and submitting them for testing. *See* N.T. Jury Trial, 8/5/14, at 321. Instead, Mr. Schwoebel took the raw data from the testing and analyzed it in accordance with the standard operating procedures that were in place at the time. *Id*. Ms. Murtha then reviewed Mr. Schwoebel's report to ensure that everything was done according to those standard operating procedures, before taking the data and applying it under the updated format applicable at the time of the re-trial, which caused her to reach a different and independent conclusion. *Id*. at 324-25. Ms. Murtha also testified that she had performed approximately 600 to 700 of these types of analyses, had been a member of the forensic science department since 2008, was mentored by Mr. Schwoebel, and had been the manager of the forensic science department since Mr. Schwoebel retired. Like the toxicologist in *Yohe*, she was familiar with standard operating procedures and able to identify deviations from those procedures. After Mr. Schwoebel's departure, Ms. Murtha was the only

individual available who had engaged in a critical analysis of the results of the tests performed. Therefore, in line with the **Yohe** analysis, Ms. Murtha was the witness at the top of the inferential chain whom Appellant had the right to confront. Thus, the admission of Ms. Murtha's testimony and expert report did not violate the confrontation clause.

Appellant argues that Ms. Murtha could not have produced an independent report because she relied on information contained in Mr. Schwoebel's report in order to generate her own findings. **See** Appellant's brief at 58-62. Appellant fails to account for the distinction between results and opinions. The results are raw data concerning the chemicals found on the tested specimens, whereas opinions are formed from an analyst's interpretation of the raw data. This distinction is best exemplified by the fact that Ms. Murtha reached a different opinion than Mr. Schwoebel. While Ms. Murtha's report necessarily incorporates the results of the testing conducted by Mr. Schwoebel, it does not contain anyone's opinion but her own. Therefore, in contrast to **Bullcoming**, Ms. Murtha's report did not simply "parrot" the prior analysis of Mr. Schwoebel. **See Yohe**, **supra** at 390.

Mr. Schwoebel's report was inadmissible absent Mr. Schwoebel's testimony. However, even without the report, Pa.R.E. 703 and 705 would still have permitted the type of expert opinion testimony given by Ms. Murtha. The rules allow expert opinion testimony based in part on otherwise inadmissible facts and data contained in a report upon which experts in the field would

reasonably rely in forming an opinion. *See also Commonwealth v. Ali*, 10 A.3d 282, 306 (Pa. 2010) ("[A] medical expert who did not perform the autopsy may testify as to cause of death as long as the testifying expert is qualified and sufficiently informed[.]") (citation omitted).

Ultimately, Ms. Murtha's testimony was admissible because she formed an independent conclusion and testified to that conclusion based on her review of both inadmissible facts and data contained in Mr. Schwoebel's report. Since Ms. Murtha synthesized that information, formed an independent opinion, and was available to be cross-examined regarding the basis of that opinion, we conclude there was no confrontation clause violation with respect to her opinion regarding the presence of gunshot residue on Appellant's clothing. Further, we determine that any error that arose from Ms. Murtha revealing Mr. Schwoebel's opinion, or the Commonwealth admitting Mr. Schwoebel's report as an exhibit, was harmless beyond a reasonable doubt because her own independent opinion testimony satisfied the confrontation clause.

With the preceding in mind, we turn to the IAC analysis. Since Ms. Murtha's testimony did not violate the confrontation clause, Appellant's ineffectiveness claim based on Attorney Sembrot's[7] failure to object to the admission lacks arguable merit. Since Mr. Schwoebel's report was cumulative of Ms. Murtha's testimony, Appellant was not prejudiced by counsel's failure

---

[7] Attorney Sembrot was Appellant's counsel at the re-trial.

to object to its admission or the references to it throughout Ms. Murtha's testimony. Accordingly, Appellant's claim was properly denied.

## IV. Cross-Examination of Detective Fetrow

Appellant's fourth claim contains three subparts. Appellant alleges that Attorney Sembrot was ineffective for failing to cross-examine Detective Fetrow regarding: (1) Daniek Burns's drug stop and flight from apprehension, (2) Tina Ashley's knowledge about whether Supreme was the shooter's intended target, and (3) the time lapse between Appellant's arrest and the seizure of his sweatshirt. *See* Appellant's brief at 73-75. We address each argument individually below.

Detective Fetrow was the lead detective assigned to Appellant's case and he testified at Appellant's federal grand jury proceeding. *See* N.T. Grand Jury Proceeding, 2/15/06, at 20. At that proceeding, he was questioned about Daniek Burns and where he was currently located. Detective Fetrow responded that he was "on the run right now. He's scared. At the time he was scared. He didn't want to be next is one of the things he told us. I don't know all his reasons." *Id*. He went on to opine that an additional possibility existed for why Burns had fled, explaining: "I know there was another incident involving Daniek and some of our patrol officers and a small amount of drugs. When they found the drugs, Daniek took off running and I haven't seen him since. Neither has anybody else." *Id*. Ultimately, he was not sure if Burns's

reason for running was the possibility of getting in trouble for a criminal charge or his fear of Appellant. *Id*.

At re-trial, Detective Fetrow testified and was cross-examined multiple times. *See* N.T. Jury Trial, 8/4/14, at 135-47; N.T. Jury Trial, 8/5/14, at 293-306; *id*. at 355-58. However, he was never asked about his grand jury testimony by either the Commonwealth or Attorney Sembrot. Appellant alleges that Attorney Sembrot was ineffective for failing to cross-examine Detective Fetrow about Burns's uncharged criminal conduct. *See* Appellant's brief at 73. Appellant further argues that he was prejudiced by this omission because the incident implied that the Commonwealth would treat Burns favorably due to his identification testimony. *Id*. The PCRA court agreed that this claim had arguable merit and that counsel admitted to having no reasonable basis for this omission at the PCRA hearing. *See* PCRA Opinion, 3/19/20, at 37-38. However, the court denied the claim because it found that there was no prejudice suffered. *Id*. at 38-39. We find no abuse of discretion.

First, Daniek Burns was questioned extensively regarding his criminal history, so the jury was aware of his potential motive to lie in that regard. Despite only being seventeen years old at the time of his testimony, Burns admitted to being a "career criminal," and told the jury about his prior criminal convictions and charges in New York and York County. *See* N.T. Jury Trial, 8/5/14, at 390-410. While he testified that he had not received anything in exchange for his testimony, Burns conceded that the night of the shooting he

had been smoking marijuana and wearing a bulletproof vest. *Id*. at 397, 405, 410. Despite the vest, marijuana, and active warrants for his arrest, Burns was not arrested that night. *Id*. at 430. Instead, the officers allowed Burns to leave with a family member after he finished giving his statement identifying Appellant as the shooter. *Id*. at 397, 405-06. Burns fled the York area, but was later picked up on a material witness warrant. *Id*. at 408. At the time of his testimony, Burns was serving a sentence at Rikers Island Prison, an adult facility, because of a drugs charge. *See* N.T. Jury Trial, 8/5/14, at 390.

Second, even Appellant concedes that the alleged uncharged drug incident occurred *after* Burns had already identified Appellant as the shooter and Appellant had been arrested. *See* Appellant's brief at 34. Therefore, it could not have played a role in Burns's motivation to make an earlier identification.

Finally, the questioning of Detective Fetrow about the uncharged criminal conduct occurred in the context of explaining why Daniek Burns fled the area. The main reason Detective Fetrow thought that Daniek Burns fled was his fear of retribution, *i.e.*, that "he would be next" because he identified Appellant. N.T. Grand Jury Proceeding, 2/15/06, at 20. Therefore, if Attorney Sembrot had questioned Detective Fetrow about the uncharged conduct, the jury could have also heard about Daniek Burns's fear of retribution from Appellant. Such testimony could have hurt Appellant. Since Appellant has

failed to convince us that he suffered prejudice, his first sub-claim merits no relief.

Next, Appellant alleges that Attorney Sembrot was ineffective for not cross-examining Detective Fetrow about the validity of Tina Ashley's excited utterance in which she identified Supreme as the shooter's intended target. *See* Appellant's brief at 73. At re-trial, Detective Fetrow testified that when he arrived on scene, Tina Ashley was very emotional and loud. *See* N.T. Jury Trial, 8/4/14, at 140. While she was talking to Officer Randy Searfoss, Detective Fetrow heard her yell, "He knows who was shooting. They were shooting at him." *Id*. at 141. As she yelled, he noticed that she was directing her comments at two males that were walking down the street, Jeffrey "Supreme" Mable and Valentine Bonilla, but then she specifically referred to one by the name "Supreme," and pointed him out. *Id*. After overhearing this exchange, Detective Fetrow detained Supreme and Bonilla, keeping them separate until he could interview each of them at the station. *Id*. at 141-42. At the first trial, Tina Ashley testified that she did not know if Supreme was the shooter's target, only that the shooter appeared to be aiming for Supreme's group. *See* N.T. Jury Trial, 9/13/06, at 132. Testimony about this excited utterance was omitted at the retrial.

The PCRA court explained its reasoning for not believing that this omission amounted to ineffective assistance of counsel as follows:

> The potential targeting of Mr. Mable is but one fact in the trial and not a determinative one. The use of a firearm to target

*someone* is sufficient to undergird transferred intent for a first-degree murder charge. There is evidence of [Appellant's] intent to target Mr. Mable, via Apollonia Snyder's testimony that [Appellant] stated he was going to kill Mr. Mable. And there is evidence of [Appellant's] motive to target Mr. Mable, via testimony that [Appellant] was evasive regarding who shot him prior to the murder of Ms. Witter. Detective Fetrow's testimony merely supplied Ms. Ashley's excited utterance that Mr. Mable, amongst others, knew they were being shot at. Detective Fetrow seems to have narrowed Ms. Ashley's identification of targets down to just one; however, the other evidence of the trial points to [Appellant] having motive and intent regarding Mr. Mable. We do not believe arguable merit has been sufficiently made out.

We look at whether retrial counsel's actions lacked any reasonable basis. The alternative strategy offered is that retrial counsel should have cross-examined Detective Fetrow and ferreted out this inconsistency between his report and Ms. Ashley's prior statements and Detective Fetrow's certainty at trial. We cannot find a *substantially* greater chance of success had this strategy been pursued. Mr. Mable was, at the very least, identified as a possible target by Ms. Ashley. [Appellant] matched some descriptions of the shooter in stature and in the clothing worn by the shooter and, seemingly, by [Appellant] at the time of his arrest. [Appellant's] clothes were covered in gunshot residue and its components. We do not believe that there was a substantially greater chance of success if this line of questioning had been pursued. A similar analysis persists for the third prong, which is prejudice. There was too much other evidence indicating [Appellant] to have been the shooter for this supposed error by retrial counsel to have been determinative. It is therefore denied.

PCRA Opinion, 3/19/20 at 40-41.

Our review reveals that the PCRA court's findings are supported by the record and not the result of any abuse of discretion. Notably, Supreme testified at the re-trial that he did not know who the shooter's intended target was. *See* N.T. Jury Trial, 8/6/14, at 232-33. Therefore, the probative value

- 31 -

of Tina Ashley's excited utterance was reduced considerably by his testimony. Accordingly, no relief is due on the second sub-part of Appellant's fourth claim.

Finally, Appellant challenges counsel's effectiveness for not parsing out a passing comment by Detective Fetrow that the sweatshirt was not seized at the same time as Mr. Brenner's other items. *See* Appellant's brief at 75. Since Appellant's sweatshirt was taken from the York County prison at a later time, Appellant argues that this increased the probability of contamination and Attorney Sembrot was ineffective for not pointing this out. *Id*. The PCRA court did not find this allegation persuasive, explaining:

> We cannot find a *substantially* greater chance of success had the jury been aware of the conclusions drawn in the proffered articles. The jury was already aware from the testimony of the GSR expert, Ms. Allison Murtha, that there was very little evidence of GSR on the sweatshirt in question. Rather, the majority of the GSR located on [Appellant's] clothing was found on items that were seized almost immediately upon [Appellant] surrendering to authorities. Detective Fetrow testified to the continual use of latex gloves to handle these articles of clothing, which acted as a safeguard to contamination. The GSR on items aside from the sweatshirt militates towards [Appellant] being a shooter – even if this is not conclusive when one considers lawful means of GSR being deposited. It is noteworthy that Ms. Murtha testified to the very high levels of GSR and related particulate on [the belt] as compared to the many other thousands [of articles] she has tested in her career. The low levels of GSR – indicated particles on [Appellant's] hoodie comport with Ms. Murtha's testimony that particulate loss can occur with increased motion and temporal delays from deposit to collection. We do not see that the articles supplied by the defense would have swayed a jurying regarding GSR evidence. The [Appellant] was covered in GSR and associated particles on all items of clothing save the sweatshirt.

*See* PCRA Opinion, 3/19/20, at 42.

We agree with the PCRA court's apt analysis. Appellant's shoes, belt, and sneakers, which contained the probative GSR evidence, were collected within minutes of his being taken into custody. *See* N.T. Jury Trial, 8/5/14, at 356. However, even with this evidence, the jury was made aware that contamination was an issue because Appellant was not arrested until six days after the shooting. *Id*. at 293. Ms. Murtha testified that gunshot residue can easily dissipate from clothing by simply moving around, sweating, or even exposing it to wind. *Id*. at 334. Therefore, the jury was well-aware of the potential contamination issues present for even the most probative of the gun shot residue evidence. The sweatshirt, which the jury was aware was collected later than the other items, did not have any three-component gunshot residue on it. *Id*. at 330. Therefore, its main relevance was not the presence of particles consistent with gunshot residue, but that it matched the one worn by the shooter according to some of the eyewitness descriptions. Thus, it is not likely that the outcome would have changed if Detective Fetrow had been cross-examined about the exact time and location that the sweatshirt was seized, and no relief is due.

**V. Failure to Present Legitimate Reason for Gun-Shot Residue**

In his fifth claim, Appellant alleges that Attorney Sembrot was ineffective for declining to present evidence that would have shown legitimate reasons for the gunshot residue found on his clothing at re-trial, namely: that Appellant had legally purchased firearms in the past, that Appellant was

licensed to carry a firearm, and that Appellant owned clothing with gunshot residue on it that was not alleged to have been involved. *See* Appellant's brief at 78. Appellant argues that because these pieces of evidence would have provided the jury with an alternate and legitimate explanation for why there was gunshot residue on his belt, shoes, and clothing, he was prejudiced by its omission. *Id*. at 80. The PCRA court disagreed, finding Attorney Sembrot's testimony at the PCRA hearing credible and persuasive evidence of a reasonable trial strategy. *See* PCRA Opinion, 3/19/20, at 44-45. The PCRA court's findings are supported by the record.

"In determining whether counsel's action was reasonable, we do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had *any* reasonable basis." *Commonwealth v. Washington*, 927 A.2d 586, 594 (Pa. 2007) (citations omitted). At the PCRA hearing, Attorney Sembrot testified that he was aware that Appellant had a license to carry and legally owned firearms. *See* N.T., 8/27/18, at 73. While he discussed the possibility of presenting this evidence to the jury with Appellant, he ultimately took the position that "[he] didn't want to put a gun in [his] client's hands for the jury to consider that fact. I wanted to distance my client from any gun." *Id*. at 74. Attorney Sembrot explained that because he could see the evidence "cutting both ways" and could not anticipate how the jury would have accepted such evidence, he chose to omit it. *Id*. Since Attorney Sembrot's decision

was based upon a reasonable strategy to effectuate Appellant's interests, this claim fails.

## VI. Failure to Contradict Apollonia Snyder's Testimony

In Appellant's sixth claim, he alleges that Attorney Sembrot was ineffective for failing to present two witnesses whom he alleges would have contradicted Apollonia Snyder's re-trial testimony. *See* Appellant's brief at 84-85. At re-trial, Apollonia Snyder testified that, a couple of days before the shooting, she was bar hopping with Appellant, who had been a friend of hers since high school. *See* N.T. Jury Trial, 8/6/14, at 40-41. One of the bars they went to that day was called "Cheers." *Id*. While they were driving between bars, Appellant made a phone call. *Id*. at 42. Accordingly to Ms. Snyder, Appellant told the person on the other end of the line, someone whom he referred to as "Man," that he was going to "pop Supreme when he seen him," using "a very aggressive tone." *Id*. at 42, 51. While he was talking to "Man," Appellant was also playing with a gun in his lap. *Id*. at 42. She testified that no one else was in the car with them when this conversation occurred. *Id*. at 46.

At the PCRA hearing, Appellant called two witnesses who he claimed would have contradicted Snyder's testimony. Nathaniel "Man" Williams testified that he knew Appellant and would have been willing to testify at Appellant's re-trial, but that he did not have Appellant's phone number and never had a conversation with him about shooting Supreme. *See* N.T. PCRA

Hearing, 7/2/18, at 9-13. Yolanda Dorman testified that she knew both Appellant and Apollonia Snyder and that she would have been willing to testify at Appellant's re-trial. *See* N.T. PCRA Hearing, 8/27/18, at 46-47. Around the time that the alleged bar hopping happened, she was a frequent patron of Cheers bar. *Id*. However, she never saw Appellant and Apollonia Snyder at Cheers or any other bar together. *Id*. In fact, she was unsure whether Appellant and Ms. Snyder knew each other. *Id*.

The PCRA court found that, while there was arguable merit to Appellant's claims, he did not demonstrate prejudice by either witness's absence. First, the PCRA court did not find credible Man's testimony that he was friends with Appellant but did not have a cell phone and never spoke with Appellant on the phone. *See* PCRA Court Opinion, 3/19/20, at 47. Therefore, this testimony would not have impacted the credibility of Apollonia Snyder's testimony. *Id*. Next, the PCRA court found that the probative value of Ms. Dorman's testimony was questionable, since she did not seem to possess knowledge as to whether Appellant and Ms. Snyder were even acquaintances. *Id*. In light of the totality of the other evidence, and the fact that Attorney Sembrot found other ways to challenge Ms. Snyder's credibility on cross-examination, the PCRA court concluded that no relief was due. *Id*. at 49-50.

Since the PCRA court sits as the fact finder at the PCRA hearing, we grant great deference to its credibility findings where, as here, they are supported by the record. *See Commonwealth v. Johnson*, 966 A.2d 523,

532 (Pa. 2009) ("Our standard of review in PCRA appeals is limited to determining whether the findings of the PCRA court are supported by the record and free from legal error."). Even if believed, the proposed testimony of these witnesses would not necessarily preclude the jury from also finding Ms. Snyder's testimony credible. Appellant could have been speaking on the phone to someone else that he referred to as "Man" and they could have been at the "Cheers" bar when Ms. Dorman was not present.

Additionally, Attorney Sembrot found another way to challenge the credibility of Ms. Snyder's testimony. Counsel pointed out that, despite her alleged concern regarding Appellant's statements, she did not reach out to the police with this information. *See* N.T. Jury Trial, 8/6/14, at 47. Instead, she waited until the authorities contacted her, which was at a time when she was serving probation. *Id*. at 48. Although she testified that she did not receive any favorable treatment for her involvement in this case, she did admit to working as an informant for the police at the time that she provided this information about Appellant. *Id*. at 53. Accordingly, the PCRA court did not abuse its discretion when it concluded that Appellant had failed to prove that he was prejudiced by counsel's failure to call these two witnesses at trial.

## VII. Prosecutorial Misconduct

In his seventh issue, Appellant asserts that Attorney Sembrot was ineffective in failing to object to prosecutorial misconduct after the prosecutor made "multiple intentional comments that were not consistent with inferences

from the record" in his closing remarks to the jury. *See* Appellant's brief at 90. Appellant's eight allegations of misconduct, that he alleges Attorney Sembrot was ineffective for failing to object to, encompass the following statements made by the prosecutor during his closing argument: (1) "[Apollonia Snyder's] facing a guy who's now on trial for a murder that she *knows* did it;" (2) "nor is there any indication from [Apollonia Snyder] that in any way Detective Fetrow, when he called, even mentioned the name of [Appellant]. This was from her;" (3) Tina Ashley was "sitting on her porch stoop watching Jeffrey Mable dodge bullets;" (4) Tina Ashley saw Daniek Burns running past her after the second shot; (5) Ms. Ashley had Anna Witter between herself and the shooter; (6) Ms. Ashley "claims she doesn't know, doesn't know [Appellant], but did you see her waving and smiling to him when we were up at sidebar with the judge?"; (7) "then there's Lloyd Valcarcel. What do you say about Lloyd Valcarcel? The man who couldn't tell the truth if his life depended on it;" and (8) "[Appellant]'s conduct was the direct cause of the death of three innocent people . . . [Appellant] is about as cold a killer as there exists." Appellant's brief at 90-95.

The following principles guide our review:

> [A] claim of ineffective assistance grounded in trial counsel's failure to object to a prosecutor's conduct may succeed when the petitioner demonstrates that the prosecutor's actions violated a constitutionally or statutorily protected right, such as the Fifth Amendment privilege against compulsory self-incrimination or the Sixth Amendment right to a fair trial, or a constitutional interest such as due process. To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to

result in the denial of the defendant's right to a fair trial. The touchstone is fairness of the trial, not the culpability of the prosecutor. Finally, not every intemperate or improper remark mandates the granting of a new trial; reversible error occurs only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict.

*Commonwealth v. Koehler*, 36 A.3d 121, 144 (Pa. 2012). With respect to the range of permissible comments in closing arguments, this Court has stated:

It is axiomatic that during closing arguments the prosecution is limited to making comments based upon the evidence and fair deductions and inferences therefrom. Indeed, given the critical role that the Commonwealth plays in the administration of justice, a prosecutor has been historically prohibited from expressing a personal belief regarding a defendant's guilt or innocence or the veracity of the defendant or the credibility of his witnesses.

However, because trials are necessarily adversarial proceedings, prosecutors are entitled to present their arguments with reasonable latitude. Moreover, it is well settled that defendants are entitled to a fair trial, not a perfect one. Thus, a prosecutor's remarks do not constitute reversible error unless their unavoidable effect [was] to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict.

*Commonwealth v. Ligon*, 206 A.3d 515, 519-20 (Pa.Super. 2019) (citations and internal quotation marks omitted). As discussed *infra*, none of the prosecutor's statements preluded the jury from weighing the evidence objectively.

First, Appellant asserts that the prosecutor improperly characterized Ms. Snyder as being nervous on the stand because "she's facing a guy who's now on trial for a murder that she *knows* did it." N.T. Jury Trial, 8/7/14, at 338. The trial court found no merit to this allegation. *See* PCRA Opinion, 3/19/20, at 59. Instead, it determined that this was a fair inference from Ms. Snyder's testimony. *Id*. at 59. We agree. Ms. Snyder testified that she overheard Appellant make a threat upon Supreme's life in a "very aggressive tone" while manipulating a gun. N.T. Jury Trial, 8/7/14, at 42. She later came forward with this information "because it was the right thing to do." *Id*. at 45. Accordingly, the record supports the PCRA court's conclusion that the prosecutor's comment regarding Ms. Snyder's fear and belief that Appellant committed the crime was a reasonable inference from the evidence adduced at trial. *See* PCRA Opinion, 3/19/20, at 59. Therefore, Attorney Sembrot was not ineffective for failing to object to it.

Second, Appellant alleges that the prosecutor misrepresented the record when he claimed that Ms. Snyder volunteered Appellant's name to Detective Fetrow. *See* Appellant's brief at 90-91. Appellant asserts that this was error because at the first trial, Ms. Snyder testified that Detective Fetrow called her to discuss her involvement with gang activity and, at that time, asked her if she knew Appellant. *Id*. citing to N.T. Jury Trial, 9/13/06, at 80-81. Ms. Snyder responded that she did know Appellant and then brought up the shooting in which she believed Appellant was involved. *Id*.

The PCRA court agreed that the prosecutor's remark was a misstatement of Ms. Snyder's testimony at the re-trial, in which she did not discuss whether it was Detective Fetrow or herself who had initially brought up Appellant's name. Counsel did not object to it. However, the court found that Appellant was not prejudiced by this misstatement because the court cautioned the jury right before closing arguments were delivered that counsel's arguments should only be considered to the extent that the inferences counsel asked them to draw were supported by the evidence. *See* PCRA Court Opinion, 3/19/20, at 61; N.T. Jury Trial, 8/7/14, at 307-08. The jury is presumed to follow the trial court's instructions. *See Commonwealth v. Cash*, 137 A.3d 1262, 1280 (Pa. 2016). Moreover, the court determined that the prosecutor's remark was fair response to Attorney Sembrot's closing argument, wherein he questioned Ms. Snyder's credibility, reasoning that "Apollonia never came forward, okay, never." N.T. Jury Trial, 8/7/14, at 319.

The record supports the PCRA court's conclusion. Simply put, "not every intemperate or uncalled for remark by the prosecutor requires a new trial." *Commonwealth v. D'Amato*, 526 A.2d 300, 309 (Pa. 1987). This fleeting remark is plainly not the type of intentional misrepresentation that Appellant claims. *See* Appellant's brief at 90-91. Further, Appellant has not explained how this remark had the unavoidable effect of prejudicing the jury such that the jury could no longer render a fair verdict, particularly in light of the court's directive to disregard remarks that are not supported by the evidence.

Accordingly, we discern no abuse of discretion in the trial court's conclusion that Appellant was not prejudiced by counsel's failure to object to it.

Appellant's third, fourth, and fifth sub-claims allege various misstatements by the prosecutor regarding what Tina Ashley did or did not see during the shooting. **See** Appellant's brief at 91 (citing N.T. Jury Trial, 8/7/14, at 347). Attorney Sembrot did not object to any of these comments. The PCRA court aptly summarized why the first of these three claims lacked arguable merit as follows:

> Appellant complains that the ADA described Ms. Ashley as watching Mr. Mable dodge bullets and duck. The defense opines that this is inconsistent with Ms. Ashley's testimony that she was pulled inside of her building after the first shot. This claim is inconsistent with the later claim that the shooter stopped shooting as his six-shooter was out of bullets. This is so because Ms. Ashley indicated that she heard the first shot, entered her building, and then, as she claimed to have heard three shots total, she heard two more shots. Thus, by [Appellant's] own reckoning, Ms. Ashley's memories were faulty or one could infer that she was outside for more shots than she testified to, which would have allowed an inference of her watching Supreme dodge bullets or ducking. It was for the jury to determine what the facts were and who was credible. [Appellant] is engaging in the very sort of absolutist characterization of evidence that the Commonwealth did in its closing. This is what litigants in an adversarial system do. They characterize evidence and it is a competitive and heated process.

PCRA Court Opinion, 3/19/20, at 64. The PCRA court went on to conclude that the defense claim that the prosecutor's insinuation that Ms. Ashley's excited utterance meant that Supreme was the intended target was also meritless because it, too, was properly derived from Detective Fetrow's testimony. **Id**. at 65. Finally, the PCRA court concluded that the prosecutor's

remark that Ms. Ashley saw Daniek Burns flee the scene was also a permissible inference from the record. *Id*. at 66.

The PCRA court's conclusions are supported by the record. What Ms. Ashley did or did not see, how she was positioned in relation to the shooter and Anna Witter, how quickly she fled inside her house, and at what point in the shooting Daniek Burns fled were all contested points at re-trial. Ms. Ashley testified that she saw Daniek Burns there that night. *Id*. at 97. She also made conflicting statements about what she saw, the quality of the lighting, and her ability to describe the physical features of the shooter. *Id*. at 87-91. However, while she could not identify the actual shooter, she was certain that it was not Appellant. *Id*. at 93-94. As the re-trial court noted, it was for the jury to determine the witness's credibility based on the evidence presented. Accordingly, we discern no abuse of discretion in the PCRA court's resolution of Appellant's third, fourth, and fifth sub-claims as lacking arguable merit because they were all fair inferences from the evidence adduced at trial. Accordingly, Attorney Sembrot was not ineffective for failing to object to any of them.

In his sixth sub-claim, Appellant asserts that Attorney Sembrot was ineffective for failing to object to "another egregious instance of prosecutorial overreach," which was when the prosecutor claimed that Ms. Ashley acted like she did not know Appellant, but later waved to him from the witness stand while the attorneys were at sidebar. *See* Appellant's brief at 94. The remark

conflicts with Ms. Ashley's general testimony that she had known Appellant for sixteen years. *See* N.T. Jury Trial, 8/6/14, at 93. However, upon closer examination of Ms. Ashley's re-trial testimony, the PCRA court concluded that the prosecutor's statement was still a fair inference from her testimony indicating that they were not closely acquainted. *See* PCRA Court Opinion, 3/19/20, at 70 (citing *id*. (explaining that she knew Appellant in the sense that she would sometimes see him on the back patio of their building)). Ms. Ashley, by detailing that she knew Appellant from seeing him occasionally around her apartment complex, plainly implied that she was only a casual acquaintance. This level of familiarity is consistent with the prosecutor's closing argument. Thus, we agree with the PCRA court that no relief is due.

In his seventh sub-claim, Appellant attacks the prosecutor's characterization of Lloyd Valcarcel as follows:

> Then there's Lloyd Valcarcel. What do you say about Lloyd Valcarcel? The man who couldn't tell the truth if his life depended on it. Yes, yesterday he definitely said it wasn't [Appellant]. Yet, in his handwritten statement, he said, "I don't know if he knew about it, let alone did it." And in the same statement to the defense, he says, "Well, when I gave the shoe ID, I then named the color of my shoe because I was being smart, due to the fact that he was trying to place a drug sell [sic] on me," meaning Detective Fetrow. He wasn't even being interviewed by Detective Fetrow, but by Detective Nadzom, who got pulled out of bed and knew nothing about this case. Fetrow wasn't even in the room. There's no other way to put it, ladies and gentlemen he's lying.

N.T. Jury Trial, 8/7/14, at 348. *See also* Appellant's brief at 94-95. Appellant asserts that the prosecutor improperly expressed his personal belief about the falsity of Lloyd Valcarcel's testimony. *Id*. at 95.

The PCRA court disagreed. When viewed in its proper context, the court concluded that the prosecutor "merely highlighted what the jury knew already[,]" namely, that "Mr. Valcarcel had either lied when he wrote his statement that he could not say whether [Appellant] was the shooter or when Mr. Valcarcel testified that [Appellant] was not the shooter." PCRA Opinion, 3/19/20, at 73. The PCRA court cited relevant case law and concluded that the prosecutor's comments were neither "unfair nor unduly prejudicial." *Id*. Again, the well-reasoned conclusion of the PCRA court was supported by the record and consistent with relevant precedent. *Id*. (citing ***Commonwealth v. Carpenter***, 515 A.2d 531, 536 (Pa. 1987)). Accordingly, we discern no abuse of discretion and Appellant's seventh sub-claim fails.

In his final allegation of prosecutorial misconduct, Appellant attacks the prosecutor's characterization of him as "about as cold a killer as there exists." Appellant's brief at 95 (citing N.T. Jury Trial, 8/7/14, at 354). Appellant relies heavily on factually distinguishing his case from ***Commonwealth v. Clancy***, 192 A.3d 44 (Pa. 2018), in order to support his contention that the statement was impermissible. Appellant's brief at 98. However, like the PCRA court, we find Appellant's argument unpersuasive.

The murder in ***Clancy*** arose out of a street fight where the defendant shot and killed an unarmed man. *Id*. at 47. The Commonwealth charged the defendant with criminal homicide and, at trial, the defendant did not dispute that he killed the victim. Instead, he argued that he lacked the necessary

intent to kill because he acted in the heat of passion, discharging his firearm accidentally. *Id*. at 48, 65. In a PCRA petition, Clancy unsuccessfully challenged his trial counsel's ineffectiveness for failing to object to the prosecutor's closing remarks, which characterized him as a "dangerous man" and a "cold blooded killer." *Id*. at 47.

Our Supreme Court affirmed the denial of PCRA relief, finding that the term "cold blooded murder" directly related to the premeditation element of the crime charged. *Id*. at 66-67. Therefore, the *Clancy* Court concluded that the prosecution's use of the term "cold blooded killer" "constituted permissible (if aggressive) oratorical flair." *Id*. at 67. The High Court went on to find that the prosecutor's statement was also a fair response to Appellant's heat of passion defense. Our Supreme Court thereafter instructed courts faced with similar issues that:

> Prosecutorial remarks do not constitute permissible oratorical flair simply because they are based upon the underlying facts of the case *or* because they relate to an underlying element of the crime. Both requirements must be met. To fulfill his duty as an advocate, a prosecutor has numerous tools in his arsenal. Recourse to inappropriate invective is not one of them.

*Id*. at 68.

In the instant case, the prosecutor's characterization of Appellant as "as cold a killer as there exists," when viewed in its proper context, is tethered to the premeditation element of the crime charged, first-degree murder, and the evidence adduced at trial. In closing, the prosecutor stated the following:

Certainly, when you kill or harm three people, [Appellant]'s conduct was the direct cause of the death of three innocent people at the time he had the specific intent to kill, you don't get a free pass just because you're a bad shot. [Appellant] is about as cold a killer as there exists. He used a deadly weapon that evening. The court will tell you that you can infer, based on that alone, that he had the specific intention to kill. He wantonly fired into a crowd of people on a busy York City street, multiple shots. What does that say about his intention, his specific intention? And he did so with callous disregard for anyone's safety for his own personal vengeance. He is guilty of murder in the first degree. Thank you.

N.T. Jury Trial, 8/7/14, at 354.

A conviction for first-degree murder requires malice, which can be demonstrated by evidence of "wickedness of disposition, hardness of heart, wanton conduct, cruelty, recklessness of consequences and a mind regardless of social duty." *Commonwealth v. Hall*, 701 A.2d 190, 200 (Pa. 1997) (holding that the statements that "the only thing colder than the grave of [the victim] is this guy's heart" and that "he walked out coolly, calmly, and collected" were permissible to demonstrate malice). Throughout the trial the Commonwealth alleged that, acting in revenge for an earlier shooting, Appellant decided to open fire on a crowded street, aiming at one person, but instead hitting three innocent victims, killing one of them. Appellant's misidentification defense centered on discrediting the one eyewitness who identified him as the shooter, showing that the GSR evidence was contaminated, and disproving the Commonwealth's motive for the shooting with Jeffrey Mable's testimony that he did not have a dispute with Appellant. The prosecutor's remark was merely suggesting the conclusion that the jury

should reach based upon the evidence, namely that the Commonwealth had established the necessary *mens rea* required to convict Appellant of first-degree murder of a bystander.

Appellant counters that his case is distinguishable from **Clancy** because he pursued a mistaken-identity defense, instead of Clancy's heat of passion defense. **See** Appellant's brief at 98. While discussing fair response in the context of closing argument, the **Clancy** Court considered the relevance of Clancy's heat of passion defense. In doing so, the court commented that "it may not be proper to refer to a defendant as a "cold blooded killer" where the defense argument does not warrant that reference. For example, where the defense in first-degree murder trial is mistaken identity, rather than heat of passion, the term "cold blooded killer" may not be appropriate." **Clancy**, **supra** at 68.

Although this is a mistaken identity case, not a heat of passion defense, we cannot agree with Appellant's rote, self-serving interpretation of the **Clancy** decision. Our Supreme Court did not forbid the use of the term "cold blooded killer" in a mistaken identity case, but rather stated that it might not be proper. **Id**. In order to determine the propriety of such a label, the **Clancy** Court instructed future courts to inquire whether that phrase was based upon underlying facts and related to an underlying element of the crime. If so, then such a remark was permissible. The particular defense asserted, while relevant to the Court's analysis, was not outcome determinative.

In light of the foregoing, we conclude that the prosecutor's use of the term "as cold a killer as there exists" constituted an isolated use of oratorical flair that does not require reversal in the particular factual and elemental context presented here. The evidence outlining Appellant's actions supported the statement, which helped explain the necessary *mens rea* where the murder victim was not the intended target. The PCRA court did not err when it concluded that Appellant's ineffectiveness claim lacked merit, since the prosecutor's closing argument was not impermissible, and thus Attorney Sembrot was not ineffective for failing to object.

## VIII. Tina Ashley and Officer Randy Searfoss

In his eighth claim, Appellant asserts that Attorney Sembrot was ineffective for failing to question Tina Ashley and call Officer Randy Searfoss to testify about an excited utterance Ms. Ashley made at the crime scene. *See* Appellant's brief at 103-107.

At the first trial, Tina Ashley was asked about the excited utterance and she clarified that she was actually referring to the group of four men, which included Supreme, as the shooter's target. *See* N.T. Jury Trial, 9/13/06, at 131-32. She did not intend to single out Supreme as the shooter's only target. *Id*. At the re-trial, Tina Ashley was not asked about her excited utterance. Instead, Detective Fetrow provided the sole testimony regarding Tina Ashley's excited utterance. He testified that, while at the crime scene, he overheard Tina Ashley yell at Officer Searfoss, and in the direction of Jeffrey "Supreme"

- 49 -

Mable and Valentine Bonilla, that "He knows who was shooting. They were shooting at him." N.T. Jury Trial, 8/4/14, at 141. He then explained that she named Supreme and pointed at him as the target of her frustration. *Id*.

The PCRA court found that this claim had arguable merit, as Appellant had identified a conflict between Detective Fetrow's testimony at the re-trial and Tina Ashley's testimony at the first trial, which Attorney Sembrot did not bring to the jury's attention. *See* PCRA Opinion, 3/19/20, at 50. However, the PCRA court did not find that Appellant suffered prejudice from this discrepancy, reasoning:

> We cannot find that [Appellant] suffered prejudice. Even if a jury found that Ms. Ashley had not identified Supreme as the shooter's target, the Commonwealth still would have had Daniek Burns'[s] identification of [Appellant] as the shooter. And, though weakened, the jury still would have had the ability to infer motive based upon the earlier shooting of [Appellant] and his statements threatening Supreme's life. In spite of the supposed error, [Appellant's] clothes and accessories were still covered in GSR and its components. To our mind, the jury would likely still conclude that [Appellant] was the shooter, that [Appellant] intended to murder Supreme, or someone in the group of four that *included* Supreme, and that this intent transferred to the victim, Ms. Witter. We cannot conclude that there was any reasonable probability of a different outcome save retrial counsel's supposed error in failing to re-elicit the exact meaning of Ms. Ashley's excited utterance. Not relief is due for this claim.

*Id*. at 51-52.

We discern no abuse of discretion in the PCRA court's analysis. Given that Tina Ashley's excited utterance went to motive, not the shooter's identification, and was not the only evidence of motive, we cannot see how

exposing this discrepancy would have altered the outcome of Appellant's case. Accordingly, no relief is due on the first sub-part of Appellant's seventh claim.

Next, Appellant argues that Attorney Sembrot should have called Officer Searfoss to testify about a supplemental report he authored, wherein he indicated that Tina Ashley told him that the shooter was aiming at a group of four men which included Supreme. *See* Appellant's brief at 73-74. Officer Searfoss testified consistently with the contents of his report at the first trial, corroborating Tina Ashley's testimony. *See* N.T. Jury Trial, 9/12/06, at 184.

The PCRA court found that this claim lacked arguable merit, explaining:

> Turning to our test for ineffectiveness, we do not believe that there is arguable merit as Ms. Ashley clearly contradicted herself when she variously claimed to Officer Searfoss, at the time that he took the initial report, that she did not get a good look at the shooter and, at the retrial, that the shooter could not have been [Appellant] who[m] she had known for years . . . . Had retrial counsel called Officer Searfoss and re-elicited the requested testimony, it would have necessarily undercut the credibility of Ms. Ashley who was called as a defense witness at the retrial to state, in part, that the shooter could not have been [Appellant]. The defense would surely counter that the jury would have a right to pick and choose testimony from the various witnesses. We would not find this persuasive and so we do not believe that there is any arguable merit to this claim.

PCRA Court Opinion, 3/19/20, at 52-53.

The record supports the PCRA court's conclusion. Furthermore, testimony from Officer Searfoss or defense witness Tina Ashley suggesting that the four individuals knew the identity of the shooter, not just Supreme, could have actually harmed Appellant as Daniek Burns was one of the four individuals with Supreme that night. A defense witness indirectly asserting

that Daniek Burns knew the shooter's identity, if believed by the jury, could have bolstered Burns's eyewitness identification of Appellant as the shooter to Appellant's detriment. Accordingly, we agree that Appellant's second sub-claim merits no relief.

## VIV. IAC Failure to Introduce Photographs

In his ninth claim, Appellant alleges that Attorney Sembrot was ineffective for failing to introduce photographs demonstrating poor lighting conditions at the scene during the re-trial. *See* Appellant's brief at 109. While Appellant concedes that the jury saw several photographs of the scene, he nonetheless argues that further photographs were required to demonstrate accurately how poor the lighting conditions actually were. *Id*.

The PCRA court found that this claim failed all three prongs of the ineffectiveness test since the jury saw photos of the scene and heard differing accounts of the lighting from various witnesses. *See* PCRA Court Opinion, 3/19/21, at 55. While there were additional photographs that could have been shown, the PCRA court examined them and concluded that they were cumulative of the ones already introduced at trial. *Id*. at 55-56. In fact, the PCRA court did not agree that the unintroduced photographs actually demonstrated poor lighting. *Id*. at 56.

The record supports the PCRA court's conclusion that additional photographs of the crime scene would not have altered the outcome of trial. The lighting conditions were a heavily contested point. Almost every person

who testified that they were present at the scene that night, whether eyewitness or officer, was questioned about his or her perception of the lighting conditions. The Commonwealth admitted photographs of the scene and the majority of the witnesses testified that the lighting conditions were good. *See* N.T. Jury Trial, 8/4/14, at 151-52 (Detective Scott Hose testifying that he photographed the scene without any additional light sources because it was clear and mild outside and the block was "very well lit"); N.T. Jury Trial, 8/5/14, at 217-25 (emergency management specialist testifying about the location of traffic lights, street lights, and building lights present at the crime scene); *id*. at 248 (Alfonzo King testifying that there was a light above the shooter when he was shooting); *id*. at 418 (Daniek Burns testifying that he saw the shooter when he came under a street light on the corner of Newton Street); N.T. Jury Trial 8/6/14, at 88-89 (Tina Ashley testifying that there was a light pole that illuminated the shooter as he came out of the alleyway, a light across the street, and a light up the street towards the corner).

Only two defense witnesses testified to the contrary—that the lighting conditions were poor. *See* N.T. Jury Trial, 8/6/14, at 179 (Lloyd Valcarcel could not identify the shooter, in part, because it was dark outside); *id*. at 226 (Jeffrey Mable testifying that there was a light across the street from the shooter, but he could not identify the shooter because it was not that bright). Given the extensive attention that the lighting conditions received and the admission of multiple crime scene photographs demonstrating those

conditions, we concur that additional photographs would have been unnecessarily cumulative. Accordingly, we find that the PCRA court did not err when it denied this claim.

## X. Double Jeopardy: Charles Maner

In his tenth allegation of error, Appellant argues that former first ADA Bill Graff engaged in "egregious prosecutorial misconduct," such that a re-trial should have been prohibited on double jeopardy grounds. Appellant's brief at 112. Purportedly, there was an agreement between ADA Graff and Charles Maner that if Maner testified against Appellant, he would not be sentenced on two pending felony drug cases. *Id*. at 114. Since ADA Graff never revealed the existence of this agreement to Attorney Keenheel, ADA Graff committed an "outrageous *Brady* violation" and Attorney Sembrot was ineffective when he failed to file a pretrial motion to bar retrial on double jeopardy grounds. *Id*. at 119. The PCRA court disagreed, finding that a double jeopardy motion on these grounds would not have succeeded since there was no evidence that such an agreement existed. *See* PCRA Court Opinion, date at 80.

"An appeal grounded in double jeopardy raises a question of constitutional law. This court's scope of review in making a determination on a question of law is, as always, plenary. As with all questions of law, the appellate standard of review is *de novo*." *Commonwealth v. Vargas*, 947 A.2d 777, 780 (Pa.Super. 2008) (internal citations omitted). If the factual findings of the PCRA court impact its double jeopardy ruling, we apply a

deferential standard to review those assessments. ***Commonwealth v. Wood***, 803 A.2d 217, 220 (Pa.Super. 2002).

Prosecutorial misconduct can implicate the double jeopardy clause. In assessing such a claim, we are guided by the following:

> The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Article 1, § 10 of the Pennsylvania Constitution protect a defendant from repeated criminal prosecutions for the same offense. Ordinarily, the law permits retrial when the defendant successfully moves for mistrial. If, however, the prosecution engages in certain forms of intentional misconduct, the Double Jeopardy Clause bars retrial. Article I, § 10, which our Supreme Court has construed more broadly than its federal counterpart, bars retrial not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial. An error by a prosecutor does not deprive the defendant of a fair trial. However, where the prosecutor's conduct changes from mere error to intentionally subverting the court process, then a fair trial is denied.

***Commonwealth v. Graham***, 109 A.3d 733, 736 (Pa.Super. 2015) (cleaned up). Thus, where a defendant alleges prosecutorial misconduct as a basis for double jeopardy protection, the critical inquiry concerns the nature of the alleged misconduct. ***Commonwealth v. Minnis***, 83 A.3d 1047, 1052 (Pa.Super. 2014). Dismissal of the charges is only appropriate where the actions of the Commonwealth are "egregious" and it is "demonstrable [that] prejudice will be suffered by the defendant if the charges are not dismissed." ***Commonwealth v. Adams***, 177 A.3d 359, 372 (Pa.Super. 2017). ***See also Commonwealth v. Wilson***, 147 A.3d 7, 13 (Pa.Super. 2016) ("[D]ismissal

of charges is an extreme sanction that should be imposed sparingly and only in cases of blatant prosecutorial misconduct.").

Charles Maner testified to the following at Appellant's first trial. Appellant approached him in the York County prison and told him that he felt bad about accidentally shooting a woman. *See* N.T. Jury Trial, 9/12/06, at 205, 209-11. Appellant explained that he was aiming at a man who had previously shot him and that the woman was hit by a stray bullet. *Id*. Appellant stated that he would get away with the crime if no one identified him as the shooter. *Id*. at 219.

After the jailhouse conversation, Maner contacted a state trooper he had worked with in the past, who passed along the information to ADA Graff. *Id*. at 238. While out on bail, Maner spoke with ADA Graff before leaving for Florida, where he was arrested and began serving a sentence for drug possession. *Id*. at 218. At trial, Maner testified that although he had not yet been sentenced on his pending forgery conviction, he had not been promised anything in exchange for his testimony and expected to serve time on that case once he finished his sentence in Florida. *Id*. at 218-221. On cross-examination, Maner agreed that he had many prior convictions for his "dealings with drugs over the years and up to the present," and that he had provided information to the police in the past on other individuals who were involved with drug charges. *Id*. at 238-40, 250-51.

During Appellant's first PCRA proceeding, Attorney Sembrot discovered the existence of two felony convictions for possession with intent to deliver to which Maner had pled guilty prior to the shooting in this case. At the time of Appellant's first trial, however, Maner had not yet been sentenced on those crimes. Attorney Sembrot's investigations revealed that Maner was, in fact, never sentenced at either case. Based on the foregoing, Attorney Sembrot concluded that an agreement must have been reached between the Commonwealth and Maner to avoid sentencing in these cases and counsel raised a *Brady* violation in Appellant's PCRA petition for the Commonwealth's failure to disclose the existence of this alleged plea agreement.

At the subsequent evidentiary hearing, former first ADA Graff testified that he was aware that Charles Maner had two felony drug cases pending when he testified at Appellant's first trial and that Maner had pled guilty in exchange for a sentence that would be "no worse than a county sentence." N.T. PCRA Hearing, 4/13/12, at 10-15. However, the reason for the plea negotiated sentence was that Maner was an informant who "was setting up drug dealers all over the place, and we expected him to continue to do that." *Id*. at 18. ADA Graff explained that he never turned over the plea agreement to Attorney Keenheel because it was negotiated and entered into four months before the shooting happened, so he did not think that its existence was relevant to Appellant's case. *Id*. at 15-19.

ADA Graff conceded that Maner was never sentenced, but denied that this inaction was the result of an agreement in Appellant's case. *Id*. at 41, 93. Instead, he explained that Maner was not sentenced because he fled to Florida upon his release on bail. *Id*. at 37. A bench warrant was issued for his arrest, but Maner was mistakenly transported from Florida to testify against Appellant only at a grand jury proceeding in 2006. *Id*. While he was here for the grand jury proceeding, the Commonwealth tried to serve the outstanding warrants for the drug sentencing cases. *Id*. at 37-39. However, attempts were unsuccessful because they did not use the Interstate Compact Act properly.[8] *Id*.; *see also* Order, 9/6/06 (vacating the service of the warrants without prejudice to be reissued in the future).

ADA Graff left the district attorney's office in 2009 and was unsure why Maner was never brought back for sentencing on the outstanding drug cases. *Id*. While he had no specific recollection of what happened, he agreed that he probably did not pursue Maner once he finished serving his sentence in Florida because he had assisted with the prosecution of Appellant. *Id*. at 90-94. Therefore, ADA Graff thought he would "pay him his dues" by ignoring the pending charges. *Id*. The original PCRA court found ADA Graff's testimony credible and denied Appellant's *Brady* claim on the grounds that

---

[8] A person who is summoned from out-of-state to appear before the court on another matter cannot have outstanding warrants served upon him. *See* 42 Pa.C.S. § 5979.

Appellant had not proven that Maner was offered a deal in exchange for his testimony. *See* PCRA Court Opinion, 6/26/12, at 15-16.

Almost two years later, and before the start of Appellant's re-trial, Charles Maner appeared for sentencing on the pending drug charges. At Maner's sentencing hearing, ADA Graff reiterated the decision-making process he testified to at Appellant's PCRA hearing, explaining that the delay in sentencing was due to his intention to "let [the cases] disappear and go away" after Maner testified against Appellant. *See* N.T. Sentencing Hearing, 4/22/14, at 19. While the plea agreement was based on information Maner provided on other drug dealers, after he testified against Appellant, ADA Graff decided on his own that he wanted to show Maner his appreciation by making these two cases go away. *Id*. at 17. Maner also testified at the hearing, consistent with the testimony of ADA Graff, that he was not offered anything in exchange for his testimony against Appellant. It was only after his testimony was completed, and he inquired about his pending drug cases, that ADA Graff told him to return to Florida and not worry about the cases. The sentencing court found that an agreement between the Commonwealth and Maner was entered into after he testified against Appellant, and dismissed the charges with prejudice. *Id*. at 41-43.

Based upon our review of the certified record in this matter, we discern no error on the part of the PCRA court in concluding that Appellant failed to prove the existence of an agreement between the Commonwealth and Charles

Maner in exchange for his testimony against Appellant. To the extent that any tacit or express agreements between Maner and ADA Graff existed, they preceded the commission of Appellant's crimes and were related to Maner's activity as a confidential informant in unrelated drug cases. There is support in the record for that position based on ADA Graff's testimony at two separate hearings, which the original PCRA court and a separate sentencing court deemed credible. Appellant counters that he is entitled to relief because **Commonwealth v. Smith**, 615 A.3d 321 (Pa. 1992), presents a contrary result in a "scenario [that] is identical to the facts herein." Appellant's brief 112-13.

In **Smith**, the defendant was convicted of murdering a woman and her children, but was granted a new trial based upon the erroneous admission of hearsay. After the award of the new trial, Smith discovered that the Commonwealth deliberately withheld material exculpatory evidence. Specifically, the prosecutor intentionally did not inform the defendant about a plea agreement that it reached with its chief witness, who had actually lied on the witness stand when he denied that the Commonwealth had promised him favorable treatment in return for his testimony. Furthermore, the district attorney deliberately withheld physical evidence that he knew was exculpatory to the defendant because it supported the defendant's theory of the case. Indeed, when a police officer testified about the existence of the evidence, the

prosecutor presented testimony from other police witnesses suggesting that the first officer was fabricating his testimony.

The **Smith** Court characterized the actions of the district attorney as egregious and clearly undertaken in bad faith. It discharged the defendant and ruled that "the double jeopardy clause bars retrial following intentional prosecutorial misconduct designed to secure a conviction through the concealment of exculpatory evidence." **Id**. at 322. It concluded that, when the record demonstrates the presence of "prosecutorial misconduct undertaken in bad faith to prejudice or harass the defendant," as opposed to "prosecutorial error," double jeopardy prevents a second trial because there is a "breakdown of the integrity of the judicial proceeding[.]" **Id**. at 324. Under **Smith**, discharge is warranted only when "the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." **Id**. at 325.

In this case, the prosecution's actions did not come close to the type of clearly egregious misconduct that occurred in **Smith**. Unlike in **Smith**, no agreement existed between the Commonwealth and Charles Maner for his testimony. Therefore, the Commonwealth did not suborn perjury when it allowed Maner to testify that he had not been offered anything in exchange for his testimony. The only agreement that existed was negotiated and entered into before Appellant committed his crimes. Regardless of whether the Commonwealth should have informed defense counsel of the existence of

this prior agreement, this "prosecutorial error" was not directly linked to Appellant's case. Therefore, it did not amount to a breakdown in the judicial proceeding. While the jury was not aware of the specific parameters of this plea agreement, the jury was told about Maner's extensive criminal history and cooperation with the Commonwealth in the past. Since a double jeopardy motion would have been unsuccessful, counsel was not ineffective for failing to file one. *See Commonwealth v. Spotz*, 896 A.2d at 1191, 1222 (Pa. 2006). Accordingly, Appellant's tenth claim is without merit.

## XI. Cumulative prejudice

In his final allegation of error, Appellant raises a cumulative prejudice claim, contending that all of the alleged instances of ineffectiveness asserted in his brief, when viewed together, render an even stronger case that he should be granted a new trial. *See* Appellant's brief at 120-25. The PCRA court denied Appellant's claim of cumulative effect based on its findings that none of Appellant's individual claims warranted relief. *See* PCRA Opinion at 97.

Our Supreme Court has recognized that "no number of failed [ineffectiveness] claims may collectively warrant relief if they fail to do so individually." *Commonwealth v. Johnson*, 966 A.2d 523, 532 (Pa. 2009) (quoting *Commonwealth v. Washington*, 927 A.2d 586, 617 (Pa. 2007)). However, our Supreme Court has clarified that this principle applies to claims that fail because of a lack of merit or arguable merit. *Commonwealth v.*

*Sattazahn*, 952 A.2d 640, 671 (Pa. 2008). When the failure of individual claims is grounded in lack of prejudice, then "[the] cumulative prejudice from individual claims may be properly assessed in the aggregate." *Commonwealth v. Hutchinson*, 25 A.3d 277, 319 (Pa. 2011).

We have affirmed the denial of Appellant's first, third, fifth, seventh, ninth, and tenth claims based on a lack of merit or a finding that Appellant's attorney had a reasonable basis for his inaction. Therefore, there is no basis for a claim of cumulative error with regard to these claims. With regard to the few claims that we concluded were properly denied based on a lack of prejudice, we are satisfied that prejudice is lacking on a collective basis relative to those claims as well. These claims involved the absence of expert testimony on eyewitness identification, the allegedly inadequate cross-examination of Detective Fetrow, choice of impeachment for Apollonia Snyder, and the failure to clarify to whom Tina Ashley was referring when she identified the shooter's target. These claims are factually and legally independent, except for the ones referring to Tina Ashley's excited utterance. We previously concluded that Tina Ashley's excited utterance was but a small piece of the evidence used to convict Appellant, and that further examination of it could have actually bolstered Daniek Burns's eyewitness identification. Viewing these two issues together does not alter our view that the alleged ineffectiveness did not change the outcome of the trial.

Having reviewed all of Appellant's issues and concluding that none warrant relief, we affirm the order of the PCRA court denying Appellant's petition.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 05/18/2021